IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CHARLES WAGNER,

      Plaintiff,

v.                                                      No. 04-2696 B

MERIT DISTRIBUTION, et al.,

      Defendants.

_____

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
_____

## INTRODUCTION

This lawsuit has been brought by the Plaintiff, Charles Wagner, against the Defendants,

Merit Distribution, Inc. ("Merit"); James Austin, Sr. ("Austin Sr."); James Austin, Jr. ("Austin Jr.");

and Austin Truck & Trailer Repair Center, LLC ("Austin Truck") pursuant to 42 U.S.C. § 1981.

Specifically, the Plaintiff, an African-American, alleges that he suffered from race discrimination

in the form of disparate treatment, was subjected to a racially hostile work environment, and was

ultimately terminated because he complained of discriminatory treatment.  In addition to his federal

claim, Wagner also seeks damages for intentional infliction of emotional distress under Tennessee

state law.  The Defendants, in separately filed motions, seek summary judgment under Rule 56 of

the Federal Rules of Civil Procedure.  Defendants Merit, Austin Sr. and Austin Jr. request

disposition as to all claims, while Austin Truck seeks partial summary judgment on Wagner's § 1981

discharge and state law claim.

## STANDARD OF REVIEW

Rule 56(c) provides that a

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on her pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322, 106 S.Ct. at 2552.  In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."  Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).  The "judge may not make credibility determinations or weigh the evidence."  Adams v. Metiva, 31

2

F.3d 375, 379 (6th Cir. 1994).

## FACTS AND PROCEDURAL BACKGROUND

The following facts are undisputed unless otherwise noted.  Austin Truck is a Tennessee limited liability company operated by Austin Jr. and owned by Melanie Austin, Austin Jr.'s wife.  Austin Jr. was responsible for hiring, firing and supervising employees at Austin Truck.  The Plaintiff was employed by Austin Truck from July through October 2003 as a "clean up and iron man."  He was supervised by Austin Jr. and Mike Vick, a diesel mechanic.

Although denied by Austin Jr., it is the Plaintiff's position that he complained to Austin Jr. on three occasions concerning Vick's repeated use of the word "nigger" with respect to him and asked Austin Jr. to speak to Vick.  Wagner claims that, on one occasion during the second or third month of his employment with Austin Truck, Vick told him that he was "one of the slowest niggers he ever met in his life" while the Plaintiff was changing the oil in a truck.  Wagner told Austin Jr., who could hear the remark, that "[m]an, you need to talk to Mike because I don't play racism, you know."  According to the Plaintiff, Austin Jr. merely laughed, shrugged his shoulders and giggled.

Around the end of the third month or middle of the fourth month of his employment, Vick stated to Wagner to "[g]o get the part, nigger" or "[n]igger, we got some parts for you to pick up at K-Mart."  The Plaintiff again requested that Austin Jr. speak to Vick because he did not appreciate the comment, which offended him.  Austin Jr. again responded with a shrug and a laugh and nothing else.  Wagner approached Austin Jr. a third time after being slapped by Vick.  Vick tapped the Plaintiff on the shoulder and, when he turned around, slapped him with one hand.  Vick then said, "[y]ou don't like that, I will slap you with two hands," and proceeded to slap the Plaintiff on both cheeks.  When he complained about the incident to Austin Jr., his employer said, "Charlie, if you

can't take a fucking joke, you need to find another job."   The Plaintiff also claims that Vick displayed a confederate flag in his work area and that he mentioned the large size of the flag to Austin, Jr.   There is no indication, however, that he perceived anything racial about the display. Austin, Jr. denies that Wagner ever complained about racial harassment or about Vick.   He also denies making the statement attributed to him by Wagner or hearing Vick use the word "nigger" in the workplace.

Wagner was fired on November 2, 2003 because, according to the Defendants, he failed to finish washing a truck.   The Defendants aver that on the preceding afternoon he asked to leave early to do something with his family.   Austin Jr. agreed on the condition that the wash be completed before the customer arrived the next morning.   By 10:00 a.m. the following day when the customer called, the truck had not been washed.   Austin Jr. completed the job himself and fired Wagner that evening for failure to report to work or to follow instructions.

The Plaintiff alleges that he spoke with a representative of the Equal Employment Opportunity Commission (the "EEOC") concerning the slapping incident and was discharged a week or two later.   He contends that he arrived at work at 8:00 a.m. Sunday morning to wash the truck but that the pressure washer was not operating properly.   He telephoned Austin Jr. who instructed him to contact Patrick Perry for advice on how to repair it.   Wagner maintains that Perry told him he did not work for Austin Truck and was not going to get out of bed for anyone.   He called Austin Jr. back and was directed to "shut down the building, clock out and go to the house," which he did.   The Plaintiff alleges he did not hear from Austin Jr. again until he was fired later in the day.   It is the Defendants' position that the power washer used by Austin Jr. to complete the wash was the same one Wagner claimed was broken.   According to the Defendants, at the time of his termination,

neither Austin Jr. nor anyone else at Austin Truck was aware Wagner had filed an EEOC claim, which was dated December 8, 2003.

<u>POSITIONS OF THE PARTIES AND ANALYSIS</u>

<u>The Statutory Provision and Elements of the § 1981 Claim.</u>

Section 1981, in relevant part, provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).  The statute is applicable to claims of racial discrimination in the employment context.  <u>See</u> <u>Noble v. Brinker Int'l, Inc.</u>, 391 F.3d 715, 720 (6th Cir. 2004), <u>cert. denied</u>, ___ U.S. ___, 126 S.Ct. 353, 163 L.Ed.2d 62 (2005).  The Sixth Circuit has instructed that "[t]he elements of a prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII[1] and § 1981."[2]  <u>Id.</u> (citations and internal quotation marks omitted).  A discrimination claim may be shown by direct or circumstantial evidence.  <u>White</u>

---

[1]Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e, <u>et seq.</u>, in general, forbids an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

[2]Clearly, the plain language of the statute prohibits discrimination in the making and enforcing of contracts.  Although not addressed by the parties, the Court notes that the Plaintiff did not identify in his complaint any contract of employment at issue.  Indeed, the Court assumes that Wagner's employment was at-will.  Whether the at-will employment relationship constitutes a "contract" is determined by state law.  Courts have recognized § 1981's application to at-will employment in Tennessee.  <u>See</u> <u>Aquino v. Honda of Am., Inc.</u>, 158 F.App'x 667, 673-74 n.3 (6th Cir. 2005); <u>Person v. Progressive Logistics Servs. LLC</u>, 418 F.Supp.2d 1006, 1011-12 (E.D. Tenn. 2006); <u>Blount v. D. Canale Beverages, Inc.</u>, No. 02-2813-V, 2003 WL 22890339, at *5 (W.D. Tenn. July 23, 2003); <u>Henry v. Trammell Crow SE, Inc.</u>, 34 F.Supp.2d 629, 634-35 (W.D. Tenn. 1998).  Therefore, for purposes of this order, the Court will assume that § 1981 is applicable.

v. Columbus Metro. Hous. Auth., 429 F.3d 232, 238 (6th Cir. 2005).  In cases, such as that at bar,

where there is a lack of direct evidence,

> the well-established [McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)] burden-shifting framework applies to claims of discrimination brought under Title VII [and] § 1981.  To establish a prima facie case of . . . racial discrimination under [McDonnell Douglas], [a plaintiff] must demonstrate that (1) [he] is a member of a protected class, (2) [he] was subjected to an adverse employment action, (3) [he] was qualified, and (4) [he] was treated differently than similarly-situated . . . nonminority employees for the same or similar conduct.  If [the plaintiff] sustains [his] burden of establishing a prima facie case, the burden then shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for [the adverse action].  If [the defendant] successfully carries its burden, the burden returns to [the plaintiff] to produce evidence from which a jury could find that [the defendant's] stated reason is merely pretextual.  [A plaintiff] may demonstrate pretext by showing that [the defendant's] articulated reasons (1) had no basis in fact, (2) did not actually motivate the adverse action taken against [the plaintiff], or (3) were insufficient to motivate the adverse action . . .

McClain v. Nw. Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 332 (6th Cir. 2006) (internal

citations and quotation marks omitted).

> In order to establish a prima facie case of hostile work environment based on race . . ., a plaintiff must show: 1) that he is a member of a protected class; 2) that he was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability.  In determining whether there was a hostile or abusive workplace environment, [the court is to] look to the totality of the circumstances.  Specifically, [the court is instructed to] consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . Finally, the work environment must be both objectively and subjectively offensive.

Newman v. Fed. Express Corp., 266 F.3d 401, 405 (6th Cir. 2001) (internal citations and quotation

marks omitted).  A prima facie case of retaliation may be established on a showing that the plaintiff

(1) engaged in protected activity; (2) the action was known by the defendant; (3) the defendant

6

thereafter took adverse employment action; and (4) a causal connection existed between the protected activity and the adverse employment action.  Akers v. Alvey, 338 F.3d 491, 497 (6th Cir. 2003); Wade v. Knoxville Util. Bd., 259 F.3d 452, 463 (6th Cir. 2001); Mitchell v. DaimlerChrysler Corp. Salaried Employees' Ret. Plan, No. 5:05cv1890, 2006 WL 1272566, at *3, 8 (N.D. Ohio May 9, 2006).

Efficacy of Retaliation Claims under § 1981.

Austin Truck and Austin Jr. argue in their respective motions that Wagner's discharge was based neither on his race or in retaliation for complaints of racial harassment.  First, the Defendants aver that retaliation claims may not be entertained under § 1981.  In support of their position, the Defendants refer the Court to Lowe v. Ohio Department of Rehabilitation/Correction, No. 97-3971, 1998 WL 791817 (6th Cir. Nov. 4, 1998), in which the Sixth Circuit Court of Appeals stated, without elaboration, that "[t]he dismissal of Lowe's retaliation claims under §§ 1983 and 1981 was proper because the retaliation of which she complained is that proscribed by Title VII and not a cognizable claim under § 1983."  Lowe, 1998 WL 791817 at *2.  In doing so, the court cited to Day v. Wayne County Board of Auditors, 749 F.2d 1199 (6th Cir. 1984).  A close reading of Day belies any significance the Defendants seek to attach to Lowe's application to this case.  In Day, the plaintiff sued his employer pursuant to Title VII and 42 U.S.C. §§ 1983 and 1981.  Day, 749 F.2d at 1200-01.  Although the district court dismissed the § 1981 claim, it was abandoned on appeal and therefore not addressed by the Sixth Circuit, which focused instead on Title VII's relationship to § 1983.  Id. at 1202.

The court did, however, note as follows with respect to § 1981 claims:

When originally enacted in 1964, Title VII applied only to private employment.  In cases where an employee sought relief under Title VII and § 1981 the Supreme Court

7

has interpreted Title VII as providing a non-exclusive remedy for discrimination by private employers. In <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 48-49, 94 S.Ct. 1011, 1019-20, 39 L.Ed.2d 147 (1974), the Supreme Court stated:

> The legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.

In <u>Johnson v. Railway Express Agency</u>, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975), the Court wrote:

> Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief.

> *The Court noted legislative history which stated specifically that Title VII and §* *1981, which derives from the Civil Rights Act of 1870, 'augment each other and are* *not mutually exclusive*.' quoting H.R. Rep. No. 92-238, p. 19 (1971).

<u>Id.</u> at 1203 (some internal citations omitted) (emphasis added).

The Court does not read <u>Day</u> to bolster the proposition that a retaliation claim, while clearly cognizable under Title VII, is therefore not so under § 1981. Indeed, in <u>Kim v. Nash Finch Co.</u>, 123 F.3d 1046 (8th Cir. 1997), the Eighth Circuit recognized that "[l]ike the substantive claim of racial discrimination, a claim of retaliation, in a racial discrimination context, can violate *both* Title VII and 42 U.S.C. § 1981." <u>Kim</u>, 123 F.3d at 1059 (emphasis added). Other circuits, including the Sixth Circuit, have deemed § 1981 applicable to claims of retaliatory termination of employment based on race. <u>See</u> <u>Davis v. Dallas Area Rapid Transit</u>, 383 F.3d 309, 319 (5th Cir. 2004); <u>Manatt v. Bank of Am., N.A.</u>, 339 F.3d 792, 800-01 & n.11 (9th Cir. 2003); <u>Alexander v. Wis. Dep't of Health & Family Servs.</u>, 263 F.3d 673, 681-82 (7th Cir. 2001); <u>Wade</u>, 259 F.3d at 464; <u>O'Neal v. Ferguson Constr. Co.</u>, 237 F.3d 1248, 1257-58 (10th Cir. 2001). Accordingly, § 1981 is an appropriate ground

8

for Wagner's racial retaliation claim.

Interrelatedness of Corporate Defendants.

In its motion for summary judgment, Merit argues that it cannot be liable for discrimination because it was not the Plaintiff's employer.  While Merit's position seems logical at first blush, Wagner contends, and rightly so, that disputed issues of material fact exist as to the interrelatedness of Merit and Austin Truck.

The Sixth Circuit has recognized that "[a]n affiliated corporation can be liable for another corporation's actions only when there is a degree of interrelatedness between the two corporations sufficient for the court to find a departure from the 'normal' separate existence between entities." Jackson v. Fed. Express Corp., No. 04-2470-MA/A, 2006 WL 181964, at *4 (W.D. Tenn. Jan. 18, 2006) (citations and internal quotation marks omitted).

> To determine whether the corporations are sufficiently interrelated to justify liability for both, a court should consider four factors:  (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control.

Id. (quoting Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 994 (6th Cir. 1997)). "None of these factors is conclusive, and all four need not be met in every case.  Nevertheless, control over labor relations is a central concern." Swallows, 128 F.3d at 994 (internal citations omitted).

Even though he does not dispute that Austin Sr. owned Merit, Wagner maintains that Austin Sr. owned the building in which Austin Truck was located.  He asserts that, although he was an employee of Austin Truck, he performed duties at Merit from time to time.  In his deposition, Wagner testified as follows:

Q:     When you worked at Austin Truck & Trailer, were you ever required to
       perform duties for Merit?

A:     Yes, sir.

Q:     In the warehouse for Merit?

A:     Yes, sir, I would go in to -- Patrick Perry would sometime take a vacation.
       He had like two-week vacation.  He would take two, three days at a time.  So
       I was like slash warehouse cleanup, part errand man and load and unload.  So
       when Pat gone, I had to do the paperwork.  So that's how I got caught up in
       the front office talking to Patrick about that load that I had loaded or
       unloaded, and I staged it in the warehouse.  So when Mike walked up there,
       me and Pat was talking about that load, and that's how all that -- the slapping
       come about.

Q:     Who were you unloading for?

A:     I was unloading for Patrick.  I was unloading for Austin Truck -- I mean,
       Merit Distribution.

Q:     Who were you employed by?

A:     I was employed by Austin Truck & Trailer slash Merit Distribution.

Q:     That happened before?

A:     Yes, sir, it happens a lot.

(Dep. of Charles Wagner ("Wagner Dep.") at 243-44) Patrick Perry, a black supervisor who worked

for Merit since 1997, averred in his affidavit that, during his employment with Merit, he was

directed by Austin Sr. to perform duties at Merit, Austin's Repair Shop and Austin Truck.  (Aff. of

Patrick Perry ("Perry Aff.") at ¶ 4)  Perry also stated that, when problems arose with Vick, he and

Wagner, who worked for Austin Truck, complained to Austin Sr. because "he is the boss."  (Perry

Aff. at ¶ 13)[3]  In addition, Wagner offered the following testimony:

---

[3]The Court notes that the Defendants in their reply brief take issue with certain
statements made in Perry's affidavit.  However, as the Court has not, as best it can determine,

10

Q:      . . . and how did your employment at Morgan Air Conditioning come to an
        end?

A:      Well, I was called back to work for Austin Truck & Trailer.

Q:      Now, who called you to come back or who called you to communicate with
        you about working for Austin Truck & Trailer?

A:      Patrick Perry.

Q:      What did Patrick Perry tell you?

A:      He told me that Mr. Austin had wanted me to come back and work for Austin
        Truck & Trailer as a cleanup and iron man.

Q:      Cleanup and what?

A:      Iron guy.

Q:      You said Mr. Austin, Because we have two Mr. Austins in our lawsuit --

A:      Senior.

(Wagner Dep. at 54-55)  According to Wagner, Merit and Austin Truck were the same business.

(Wagner Dep. at 80)

    The Plaintiff further points to the deposition testimony of Austin Sr., who stated therein that,

after Wagner filed a charge with the EEOC against Austin Truck, he "met with the EEOC people

once they came out" because they "wanted to get some records[] and [he] helped obtain those

records."  (Dep. of James Austin, Sr. ("Austin Sr. Dep.") at 78)

    According to his deposition, Austin Jr. operates Austin Truck, but makes no income from

that entity.  Nor is he the record owner of the entity.  Rather, his wife is the record owner, but she

stays at home and never comes to the business premises.  Austin Jr. is employed as the sole

_____

relied on any of the statements to which the Defendants have specifically objected, it need not
address the Defendants' concerns.

11

mechanic of Merit, which issues a paycheck to him each week for work on Merit's trucks at the Merit location or the Austin Truck location.  Austin Truck, he advises, owns no vehicles.  (Dep. of James Austin, Jr. ("Austin Jr. Dep.") at 24-25)  Austin Jr. testified that Austin Truck does not pay rent to Merit for its space in the common building, but, rather, the Austins "work it out as far as for the trucks and stuff."  (Austin Jr. Dep. at 31)  It is undisputed that Austin Sr. is the 100 percent owner of Merit.  (Austin Sr. Dep. at 38-39)

Viewing the evidence in the light most favorable to the Plaintiff, it is the opinion of the Court that the degree of interrelation between Merit and Austin Truck goes beyond what would normally be present between two separate entities.  This relationship is evidenced in particular by the control exercised over Austin Truck by Austin Sr., the sole owner of Merit; the fact that Austin Jr., the operator of Austin Truck, is actually an employee of Merit and works at both the Merit and Austin Truck locations; and the seamless temporary movement of employees from one entity to the other. Consequently, the Court concludes that a reasonable jury could find Merit liable for illegal action suffered by the Plaintiff.

Individual Liability under § 1981.

Both Austin Sr. and Austin Jr. aver that they have no individual liability under § 1981.  The Court will first address the Plaintiff's allegations as to Austin Sr.  Wagner submits that, as owner of both Merit and Austin Truck, Austin Sr. is liable for the hostile work environment he was forced to endure.  The basis for this claim as to Austin Sr. was expressed in Wagner's deposition as follows:

Well, when I was rehired and I asked -- I told [Austin, Sr.] that I didn't want to work back there in the shop with Little Bill [(Austin, Jr.)], because Little Bill have a bad way of speaking or talking with people, and he promised me that he was going to make sure that I didn't have to go through that.

He said, "Charles, I'm going to go ahead and take care of that.  Just do exactly what

12

they ask you to do," and when all that come down, when I come to him about what happened, he treated me like I was just nothing.  He didn't even say, "Charles, I will talk to them, just go back to work."

He sat there and told me he didn't have anything to do with it, but you promised me you were going to make sure that I didn't experience that.

*       *       *

The racist abuse -- that was going on way before, and he knew that.  That's why I told them before I worked in that shop, "Man, you need to go and talk to him," and he said he will promise to take care of that, but he did not.  So he broke that promise to me.

(Wagner Dep. at 236-37)  Wagner has submitted that Austin Sr. knew of racial discrimination and animus but did nothing to stop it.  Austin Sr. argues that the Plaintiff's claims pursuant to § 1981 must be dismissed because he had no supervisory duties over Wagner or Vick, which is not disputed by Wagner, and that he took no affirmative action against the Plaintiff.

While this Circuit instructs that the Court's analysis of a § 1981 claim is essentially the same as that of a claim under Title VII, the two differ in one particular respect relevant to this case -- individual liability.  See Allen v. Ohio Dep't of Rehab. & Corr., 128 F.Supp.2d 483, 495 (S.D. Ohio 2001) (noting contrast between Title VII and § 1981 on issue of individual liability).  "[T]he law is clear that individuals may be held liable for violations of § 1981."[4]  Jones v. Cont'l Corp., 789 F.2d 1225, 1231 (6th Cir. 1986); see also Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) (applying individual liability to case alleging hostile work environment); Allen, 128 F.Supp.2d at 495.  However, "[t]o establish individual liability [under § 1981], the individual

_____

[4]"Unlike § 1981, . . . relief under Title VII is available only against an employer, not an individual supervisor or fellow employee."  Foley v. Univ. of Houston Sys., 355 F.3d 333, 340 n.8 (5th Cir. 2003); see also Wathen v. Gen. Elec. Co., 115 F.3d 400, 404-05 (6th Cir. 1997) (same); McNeail-Tunstall v. Marsh USA, 307 F.Supp.2d 955, 966 (W.D. Tenn. 2004) (same).

13

defendant must have been personally involved in the discriminatory action." Allen, 128 F.Supp.2d at 495. Therefore, in order to establish individual liability under § 1981, Wagner must prove that Austin Sr.'s discrimination was intentional and that he was personally involved in the discriminating conduct. See id.; see also Campbell v. CCL Custom Mfg., Inc., No. 03-2789B, 2006 WL 222814, at *12 (W.D. Tenn. Jan. 30, 2006). The Second Circuit has determined that "[p]ersonal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." Patterson, 375 F.3d at 229. Other courts have reached similar conclusions. See Chellen v. John Pickle Co., Inc., 434 F.Supp.2d 1069, 1107 (N.D. Okla. 2006) ("Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence"); Baker v. Aramark Unif. & Career Apparel, Inc., No. 2:04-CV-0549-GEB-GGH, 2005 WL 2122050, at *9 (E.D. Cal. Aug. 31, 2005) ("The element of personal involvement may be satisfied by proof that a supervisor had knowledge of the alleged acts of discrimination and failed to remedy or prevent them," citing Amin v. Quad/Graphics, Inc., 929 F.Supp. 73, 78 (N.D.N.Y. 1996)); Blake-McIntosh v. Cadbury Beverages, Inc., No. 3:96-CV-2554(EBB), 1999 WL 643660, at *5 (D. Conn. Aug. 18, 1999) (same). Mere negligence on the part of an individual is not sufficient. Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000). While the basis of Wagner's allegations against Austin Sr. in this case is essentially a failure to act, the Baker court suggested that "deliberate inaction rises above" the "mere negligence" found insufficient to support a § 1981 claim in Whidbee. See Baker, 2005 WL 2122050, at *10.

　　　　While the Court finds it to be a close question, it concludes, viewing, as it must, the evidence

14

in the light most favorable to the Plaintiff, that there is an issue of material fact as to whether Austin Sr. exerted sufficient control over Austin Jr. and/or employees of Austin Truck to be rendered personally liable for failing to act to remedy and/or stop the illegal acts complained of by Wagner.

The issue is much clearer with respect to Austin Jr.  The Plaintiff has offered evidence indicating that this Defendant scoffed at Wagner's objections to Vick's behavior and, at one point, advised him that if he couldn't "take a fucking joke, [he should] find another fucking job."  The Plaintiff also recalled in his deposition that Austin Jr. was present and heard one of Vick's alleged verbal racial assaults and laughed when Wagner complained.  (See Wagner Dep. at 119-20)  Thus, in the light most favorable to Wagner, the finder of fact could reasonably determine that Austin Jr. was personally involved in the illegal acts at least to the level of gross negligence in his supervision of Vick and at worst directly participated in the racial harassment and creation of a hostile work environment.[5]  Accordingly, summary judgment is not appropriate.

Racial Discrimination - The Prima Facie Case.

---

[5]The cases cited by the Defendant in support of his motion, none of which have any precedential value in this Court, are unconvincing.  Specifically, in Mackey v. Unity Health System, No. 03-CV-6049T(F), 2004 WL 1056066, at *4 (W.D.N.Y. May 10, 2004), summary judgment was granted to the individual defendant, whose personal involvement in the discriminatory acts was not even alleged.  In Kohn v. Lemmon Company, No. Civ. A. No. 97-3675, 1998 WL 67540, at *5 (E.D. Pa. Feb. 18, 1998), the court recognized that "directors, officers and employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by § 1981, regardless of whether the corporation may also be held liable" and that "individuals are personally involved in the discrimination if they authorized, directed, or participated in the alleged discriminatory conduct."  The court went on to note, however, that the failure of a supervisor, who was not otherwise personally involved in the discriminatory act, to "prevent or remedy harassment is not an affirmative link making the supervisor personally liable."  Kohn, 1998 WL 67540, at *7.  It appears to the Court that in this case the Plaintiff does not seek compensation from Austin, Jr. simply by virtue of his position as a supervisor, but also because he allegedly directly participated or actively acquiesced in the abuse.

As noted above, a plaintiff in a racial discrimination case must establish that "(1) he was a member of a protected class; (2) he suffered an adverse employment action; . . . (3) he was qualified for the position from which he was discharged"; and (4) that he was treated differently from similarly situated employees who were not members of the protected class. See Noble, 391 F.3d at 728. Austin Jr. and Austin Truck take issue with the third element, arguing that Wagner cannot satisfy the prima facie case of discrimination because, based on his failure to report for work and follow instructions, he was not "qualified" for his position. Indeed, the Defendants are correct that a plaintiff meets the qualification prong of the prima facie case "by showing that [he] was performing 'at a level which met [his] employer's legitimate expectations.'" See Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 658 (6th Cir. 2000), reh'g and suggestion for reh'g en banc denied (May 4, 2000) (citing McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990)). However, a review of the Sixth Circuit's decision in Cline reveals the fatal flaw in the Defendants' position.

Cline was a teacher at a parochial school who, during her tenure, became pregnant outside of marriage. Id. at 655-56. Her employment was governed by a contract and an "Affirmation" under which she was to "reflect the values of the Catholic Church" by "word and example" and which incorporated the teacher handbook's mission statement that the school was to "instill in our children the Gospel message of Jesus Christ." Id. at 656. The defendant declined to renew her contract for the school year after she became pregnant because she "became pregnant before she got married." Id. The district court granted the defendant summary judgment in the resulting discrimination lawsuit on the grounds that she failed to make a prima facie case as to the qualification prong. Id. at 659. Specifically, the court determined that "[b]y engaging in premarital sex, she had violated

both the Contract and the Affirmation, and her promise under them to 'live according to the principles of the Catholic Church.' *Her own actions therefore rendered her unqualified for the teaching position.*"  Id. (internal citations omitted) (emphasis added).

On appeal, the Sixth Circuit found that the district court had misapplied the McDonnell Douglas test.  In doing so, the court recognized that the prima facie case "is not onerous[,] . . . merely serves to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons for the employer's treatment of the plaintiff, [and] is only the first stage of proof in a Title VII case."  Id. at 660 (internal citations omitted).  The court went on to find as follows:

> The district court ignored these precepts when it held that Cline failed to make a prima facie showing.  In addition to setting a burden far too high, it conflated the distinct stages of the McDonnell Douglas inquiry by using [the defendant's] "nondiscriminatory reason" as a predicate for finding Cline to have failed to make a prima facie case.  The court found Cline "unqualified" under prong [three] of the prima facie case because she had not lived up to the promises she made to "exemplify the moral values taught by the Church."  Because her pregnancy due to premarital sex meant that "she no longer met all the qualifications of her position," even strong evidence as to her satisfactory performance (i.e., her evaluations and teaching record) could not overcome these moral failings.  This analysis improperly imported the later stages of the McDonnell Douglas inquiry into the initial prima facie stage.  As discussed *infra*, [the defendant] alleges that it did not renew Cline's contract because she violated its premarital sex policy, which constituted part of the broader ministerial requirements of being a . . . teacher; conversely, Cline argues that this rebuttal is a pretext for discrimination.  Rather than resolve this debate at the prima facie stage, McDonnell Douglas requires that the district court consider this dispute at the inquiry's third stage, when its role is to decide the "ultimate question" of discrimination.  In other words, when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.

Id. at 660-61 (internal citations omitted).  In this case, Austin Jr. and Austin Truck make a similar attempt to impermissibly conflate the McDonnell Douglas paradigm by using the stated reason for

firing Wagner as a predicate for arguing that he was not qualified for his job.  See White, 429 F.3d at 242 (taking note of the Sixth Circuit's warning "against conflating the first (prima facie case) and second (articulation of a legitimate nondiscriminatory reason) steps in the McDonnell Douglas analysis," citing Cline and Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 584-85 (6th Cir. 2002)).        In this case, no evidence has been proffered by the Defendants upon which the Court could base a finding as a matter of law that Wagner did not, independent of the stated reason for the termination, possess the basic skills to perform his duties.  Accordingly, he has cleared the low bar for establishing that he was qualified for the position he held.  See E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1193-94 (10th Cir. 2000) (holding it inappropriate at prima facie stage to consider defendant's proffered reason when determining whether plaintiffs were qualified; rather, plaintiffs need only produce some evidence they possessed basic skills necessary to perform the job, to which employer had offered no challenge).[6]

The Merits of the Retaliation Claim.

Austin Jr. and Austin Truck assert that Wagner has failed to prove a prima facie case for retaliation, based in part on the fact that Austin Truck does not satisfy the statutory definition of an "employer" under Title VII.  Specifically, they refer to 42 U.S.C. § 2000e(b), which defines the term for purposes of Title VII as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . ."  However, a recent panel in this circuit, recognizing that Title VII and § 1981 are not identical, illustrated the "distinct and independent" natures of the two statutes in

---

[6]As the Defendants have made no other argument concerning the discrimination claim, the Court will assume the Plaintiff has satisfied his burden for withstanding the motion for summary judgment.  The claim will therefore proceed to trial.

a footnote as follows:  "[f]or instance, Title VII applies only to those who employ more than 14

people, 42 U.S.C. § 2000e(b), *whereas § 1981 has no minimum threshold*."  Aquino, 158 F.App'x

at 676 n.5 (emphasis added).  Hence, the argument lacks merit.

These Defendants also suggest that Wagner has failed to show that he was engaged in

"protected activity," as the filing of an EEOC charge and the making of an "internal complaint" are

not protected under § 1981.  Title VII provides that

> [i]t shall be an unlawful employment practice for an employer to discriminate against
> any of his employees . . . because [the employee] has opposed any practice made an
> unlawful employment practice by this subchapter, or because he has made a charge,
> testified, assisted, or participated in any manner in an investigation, proceeding, or
> hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (1994).  The first clause "prohibits an employer from retaliating against an

employee who has 'opposed' any practice by the employer made unlawful" under the statute, and is

thereby referred to as the "opposition clause."  The second portion, the "participation clause,"

"prohibits an employer from retaliating against an employee who has 'participated' in any manner

in an investigation under Title VII."  Johnson v. Univ. of Cincinnati, 215 F.3d 561, 578 (6th Cir.),

cert. denied, 531 U.S. 1052, 121 S.Ct. 657, 148 L.Ed.2d 560 (2000).  Thus, Title VII clearly

encompasses the filing of an EEOC charge under the umbrella of "protected activity."  Courts in this

circuit have held that a plaintiff may also institute a retaliation claim under § 1981 when the

protected activity alleged is the filing of an EEOC claim, even though such a filing is not specifically

protected under § 1981.  See Newton v. Meijer Stores Ltd. P'ship, 347 F.Supp.2d 516, 523 (N. D.

Ohio 2004); see also Johnson, 215 F.3d at 578 (applying the opposition and participation clauses

of Title VII equally to § 1981 claims); Renfroe v. State Farm Mut. Auto. Ins. Co., No. 98-2339-

Ml/V, 1999 WL 33134419, at *5 (W.D. Tenn. May 7, 1999) (articulating the first prong of the §

19

1981 retaliation claim as "activity protected by § 1981").  As the Sixth Circuit recognized in Johnson, the remedial purposes of both statutes are intended to be broad.  See Johnson, 215 F.3d at 573-74.

The Defendants further aver that, even if the filing of an EEOC claim is protected under § 1981, that protection does not extend to "internal complaints."[7]  Again, the Court does not agree.  Clearly, Title VII protects internal complaints.  See Larocque v. City of Eastpointe, No. 04-74861, 2006 WL 1195868, at *5 (E.D. Mich. May 4, 2006), recons. denied 2006 WL 2038619 (E.D. Mich. June 14, 2006) (internal complaint protected activity for purposes of retaliation claim, even if ultimately unsuccessful).  In fact, in Johnson, the Sixth Circuit observed that, under the opposition clause, "the complaint may be made by anyone and it may be made to a co-worker, newspaper reporter, or anyone else about alleged discrimination against oneself or others; [and] the alleged discriminatory acts need not be actually illegal in order for the opposition clause to apply."  Johnson, 215 F.3d at 580.  The Defendants have cited to no case law to convince the Court that cases involving § 1981 retaliation claims should be analyzed any differently from those brought under Title VII.  Taking the evidence in the light most favorable to Wagner, his internal complaints to

---

[7]The Defendants assert that Wagner's alleged internal complaints about the slapping incident were not protected activity because it was not explicitly racial in nature.  In Jackson v. Quanex Corp., 191 F.3d 647, 661-62 (6th Cir. 1999), reh'g and suggestion for reh'g en banc denied (Nov. 24, 1999), the Sixth Circuit acknowledged that "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American."  In this case, considering that the alleged slapper was Vick, who was also the alleged instigator of other racial discrimination aimed at Wagner, a reasonable juror could conclude that the slap contributed to the alleged hostile work environment at Austin Truck.

management concerning racial animus was protected conduct.[8]

The Defendants next maintain that Wagner has failed to establish the second prong of the prima facie case of retaliation, as Austin Jr. had no knowledge that the Plaintiff had spoken with a representative of the EEOC at the time the Plaintiff was fired.[9]   Wagner, referring solely to his deposition testimony, posits that he told Perry he was "going to make an appointment to talk to somebody about what [was] going on."  (Wagner Dep. at 226)  Moreover, he thought Perry told Jessica Greene, Austin Truck's secretary, he had gone to the EEOC offices.  (Wagner Dep. at 232-33)  In his deposition, Wagner testified that no one else at Austin Truck was aware he had been to the EEOC.  He submits that only Perry knew and admitted to only speculating that Perry might have passed that information to Greene.  From the deposition testimony referred to by Wagner, however, he told Perry that he planned to talk to *someone* about discrimination in the workplace but never said that he specifically told Perry he intended to approach the *EEOC*.  Even if Perry did know Wagner went to the EEOC, there is no evidence that Perry told anyone.  At this point in the litigation on the eve of trial, the Plaintiff must come up with more than speculation to withstand summary judgment.  In addition, Wagner's contention that Austin Jr. may have known he went to the EEOC because, on his return from the agency, Austin Jr. berated him for taking time off for personal business requires

---

[8]For the reasons set forth herein, the Defendants' argument that the Plaintiff could not have possessed a reasonable belief that he was opposing illegal activity because of Title VII's threshold number of employees requirement and because of the non-application of § 1981 to internal complaints is also devoid of merit.  See Offutt v. Warren County Reg'l Jail, 109 F.App'x 740, 743 (6th Cir. 2004), reh'g en banc denied (Nov. 9, 2004) (plaintiff must have a reasonable belief that he was engaged in protected activity); Johnson, 215 F.3d at 579-80 (same).

[9]It is undisputed that the notice of EEOC charge was dated December 8, 2003, approximately a month after Wagner's employment was terminated.  (See Pl.'s Opp'n to Def. Austin Truck & Trailer's Mot. for Summ. J., Ex. 2(b))

a leap the Court is not at this juncture willing to make.  See In re Chapman, 228 B.R. 899, 909 (N.D.

Ohio 1998) ("it is still appropriate for the Court to grant summary judgment if the nonmoving party

rests merely upon improbable inferences and unsupported speculation").  Accordingly, summary

judgment is granted as to the retaliation claim based on the EEOC charge.

Austin Truck and Austin Jr. allege that no causal connection exists between the alleged

internal complaints and the Plaintiff's discharge because they were too far removed in time.  Wagner

has averred in this action that he complained to Austin Jr. about the slapping incident and about

Vick's frequent racial slurs.  Although it is unclear exactly when the complaints were made, Wagner

indicated in his deposition that one occurred in the second or third month of his employment, one

at the end of the third month or middle of the fourth, and the third apparently some two weeks prior

to his discharge.

> The Sixth Circuit has found timing to be a relevant factor in a showing of causal
> connection.  Although temporal proximity alone will not support an inference in the
> face of compelling evidence to the contrary, the proximity in time between protected
> activity and adverse employment action may give rise to an inference of a causal
> connection.

Parries v. Makino, Inc., 148 F.App'x 291, 301 (6th Cir. 2005) (citations and internal quotation marks

omitted).  Moreover, the Court is mindful of the Sixth Circuit's instruction that "[t]he burden of

establishing a prima facie case in a retaliation action is not onerous, but one easily met."  Nguyen

v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000).  In this case, the Court finds that two months

is sufficient to establish the final element of the prima facie case.  See Singfield v. Akron Metro.

Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004), reh'g en banc denied (Feb. 1, 2005) (three months

sufficient to establish causation element of the prima facie case).

As previously stated, upon a showing by the Plaintiff of a prima facie case of retaliation, the

burden shifts to the Defendants to establish a legitimate, nondiscriminatory reason for the action. See McClain, 440 F.3d at 332. The Defendants have identified as their reason for Wagner's discharge his failure to report to work and wash a customer's truck as instructed.

It is the position of the Plaintiff that the proffered reason is pretextual. In order to establish pretext, a plaintiff must demonstrate, by a preponderance of the evidence, that Austin Truck's stated reason for firing him was a pretext for illegal conduct. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 518-19, 113 S.Ct. 2742, 2753-54, 125 L.Ed.2d 407 (1993). He "must introduce admissible evidence to show 'that the proffered reason was not the true reason for the employment decision' and that [retaliation] was the true motivation driving the employer's determination." Barnes v. United Parcel Serv., 366 F.Supp.2d 612, 616 (W.D. Tenn. 2005) (citing Hicks, 509 U.S. at 508, 113 S.Ct. 2742). Pretext may be shown by evidence that the defendant's stated reason had no basis in fact, did not actually motivate the decision or was not sufficient to motivate the employer's action. See Manzer v. Diamond Shamrock Chem. Co. 29 F.3d 1078, 1084 (6th Cir. 1994), reh'g and suggestion for reh'g en banc denied (Sept. 22, 1994). "[E]stablishing that the employer's reason was a pretext requires that a plaintiff do more than simply impugn the legitimacy of the asserted justification; in addition, the plaintiff must also adduce evidence of the employer's [retaliatory] animus." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir. 1994). As the Supreme Court observed in Hicks, "[t]hat the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." Hicks, 509 U.S. at 523-24, 113 S.Ct. at 2756. That is, "it is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000) (citing Hicks, 509 U.S. at 519, 113 S.Ct. 2742)

(emphasis in original).

In his declaration, Austin Jr. described the events leading up to Wagner's termination as follows:

> On November 1, a Saturday, Mr. Wagner asked me if he could leave early because he had something he needed to do with his family.  I agreed, if Mr. Wagner would get a customer's truck washed before the customer arrived on Sunday morning.  Mr. Wagner assured me he would.  The next day on Sunday morning, the customer called me at home complaining that his truck had not been washed.  I went to Austin Truck at approximately 10:00 a.m. on Sunday morning and washed the man's truck myself.  Plaintiff Charles Wagner did not report to work and wash the truck as he had been instructed.  That evening, I called Charles Wagner and told him he was fired.

(Decl. of James Austin, Jr. at ¶ 4)  The Plaintiff maintains that the reason put forth by the Defendant is belied by the telephone conversation between him and Austin Jr. concerning the pressure washer on Sunday morning.  Wagner admitted in his deposition that he was to be at work on Sunday morning to wash the truck.  His deposition testimony concerning the day he was fired is as follows:

Q:     So you arrive Sunday morning is what your testimony is; right?

A:     About eight.

Q:     At what time?

A:     Eight.

Q:     Eight o'clock in the morning?

A:     Yes, sir.

Q:     What do you do?

A:     I went to the back.  I let up the shop door.

Q:     All right.

A:     And I attempted to cut on the pressure washing machine.

Q:     Okay.

A:      And water just spilled out the bottom.

Q:      What do you mean spilled out of the bottom?

A:      The holes had busted.

Q:      All right.  the pressure washer -- is that like a big hose with a nozzle on the end?

A:      Yes, sir.

Q:      What you are saying is the hose had busted?

A:      Yes.

Q:      So the water just went all over the place?

A:      Yes.

Q:      Then what did you do?

A:      I called Billy Junior, Billy Austin Junior, and reported what was going on.

Q:      All right, and what did you tell him?

A:      I told him that the hose had busted at the bottom of the pressure washer.

Q:      Okay, and what did he say?

A:      He told me to call Patrick Perry and have Patrick Perry come up there and show me how to fix it.

Q:      Okay, and what -- did Mr. Austin Junior say anything else?

A:      No, well, after I called Patrick.

                                *       *       *

A:      So I called Billy Junior back and relayed the message [that Perry "wasn't getting out of his bed for no one."]

Q:      All right, and what did you tell Mr. Austin Junior?

A:      Told him what Patrick had told me to tell him.

Q:      Okay.

A:      So he told me to shut down the building, clock out and go to the house.

(Wagner Dep. at 134-36)  The Plaintiff recalled that he did as he was told and left the facility at

about 9:00 or 9:30.  (Wagner Dep. at 137)  Austin Jr. related in his deposition that Wagner did not

tell him the pressure washer would not work until Monday morning.  (Austin Jr. Dep. at 48)

Therefore, viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury

could find that the conversation concerning the pressure washer occurred on Sunday, prior to the

discharge and, by extension, that the Defendants' proffered reason for firing Wager -- that he failed

to show up at work Sunday morning to wash the truck -- had no basis in fact and must be

disbelieved.  Consequently, the motion for summary judgment as to the retaliation claim must be

denied.

State Claims of Outrageous Conduct.

Finally, the Defendants request an order dismissing the Plaintiff's state law claim of

intentional infliction of emotional distress, otherwise known as outrageous conduct.  In order to

establish a claim of outrageous conduct in Tennessee, the Plaintiff must demonstrate that the conduct

complained of (1) was intentional or reckless (2) was so outrageous so as not to be tolerated by

civilized society; and (3) resulted in serious mental injury.[10]  Bain v. Wells, 936 S.W.2d 618, 622

(Tenn. 1997).  "Liability for mental distress damages 'does not extend to mere insults, indignities,

---

[10]The Defendants argue that summary judgment is appropriate because the Plaintiff failed
to bring forth expert medical or scientific proof to support the third element of the prima facie
case.  However, the only case cited by the Defendants in support of their position, Camper v.
Minor, 915 S.W.2d 437, 446 (Tenn. 1996), deals with a claim of *negligent* infliction of
emotional distress, a separate and distinct cause of action not alleged by the Plaintiff in this case.
When the claim is for intentional infliction of emotional distress, as here, a plaintiff is normally
not required to support his claim of serious mental injury by expert proof.  See Miller v.
Willbanks, 8 S.W.3d 607, 615 (Tenn. 1999).

threats, annoyances, petty oppression or other trivialities.'"  <u>Alexander v. Newman</u>, 345 F.Supp.2d 876, 887 (W.D. Tenn. 2004) (quoting <u>Bain</u>, 936 S.W.2d at 622).  Courts have cautioned that "some degree of transient and trivial emotional distress is a part of the price of living among people." <u>Miller</u>, 8 S.W.3d at 615.

> To determine whether conduct is so intolerable as to be outrageous, Tennessee courts apply the following standard enunciated in the Restatement (Second) of Torts § 46, comment d:  The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

<u>Alexander</u>, 345 F.Supp.2d at 887-88 (citing <u>Bain</u>, 936 S.W.2d at 623).  The standard is an exacting one.  <u>Miller</u>, 8 S.W.3d at 614.

In this case the Plaintiff has alleged that he was subjected to repeated racial slurs and was physically assaulted.  He testified in his deposition that he suffered from sleeplessness, cold sweats, and anger.  Although the Defendants point out that he has failed to seek professional help for his claimed mental injury, that failure should not, in the Court's view, be dispositive, particularly when, as has been argued here, the Plaintiff could not afford such services.  <u>See</u> <u>Barrett v. Outlet Broadcasting, Inc.</u>, 22 F.Supp.2d 726, 749 (S.D. Ohio 1997) (failure to seek professional help not determinative of plaintiff's claim, particularly when cost was a factor).  Thus, the motion for summary judgment on the intentional infliction of emotional distress claim is denied.

<u>CONCLUSION</u>

For the reasons set forth herein, the motions of the Defendants for summary judgment are DENIED with the exception that the request for summary judgment as to the claim of retaliation for filing a charge with the EEOC is GRANTED.

IT IS SO ORDERED this 10th day of August, 2006.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE